**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 7** |
| **MICHAEL LYNN RIGGS and** | ) | |
| **VIRGINIA HARRIET RIGGS** | ) | |
| | ) | |
| Debtors. | ) | **CASE NO.  12-71761** |

_____

### MEMORANDUM DECISION

   The United States Trustee has filed a Motion to Dismiss this case pursuant to 11 U.S.C. § 707(b)(3) ("the Motion") asserting that "the totality of the circumstances . . . of [their] financial situation demonstrates abuse" of the provisions of Chapter 7 of the Bankruptcy Code.  The Motion presents a challenging issue of interpretation under the facts of this case because a part of that "totality of the circumstances" is the receipt by the male Debtor of Social Security income which under the § 707(b)(2) presumption of abuse is explicitly excluded from consideration. This question whether such income should be taken into account in the § 707(b)(3) "totality of the circumstances" test has elicited differing answers from the bankruptcy and appellate courts which have attempted to resolve it, some holding that it is appropriate under § 707(b)(3) to consider such income as unavoidably being one factor, often a very important one, in sizing up bankruptcy debtors' overall "financial situation,"[1] while other authority has concluded that such consideration is improper and at odds with Congressional intent to shield Social Security

_____

[1] _See In re Calhoun_, 396 B.R. 270, 276 (Bankr. D.S.C. 2008) (stating "Congress clearly knew how to exclude benefits under the Social Security Act from consideration but did not do so in connection with the § 707(b)(3)(B) totality of the circumstances test."), _aff'd on other grounds_, 650 F.3d 338 (4th Cir. S.C. 2011); and _In re Booker_, 399 B.R. 662, 667 (Bankr. W.D. Mo. 2009) (holding that "Social Security income is part of the totality of the Debtors' financial circumstances.").

benefits from being forcibly utilized, directly or indirectly, to pay creditors.[2]  While arriving at a

completely intellectually satisfying resolution of this conundrum is a daunting endeavor, this

Court has been greatly assisted in that effort by the excellent briefs on this issue which have been

provided by counsel and it wishes to note and express its appreciation to them for the quality of

their advocacy.  For the reasons hereafter noted and upon the facts determined below, the Court

concludes that the Motion should be granted.

PROCEDURAL HISTORY

Michael and Virginia Riggs filed in this Court a petition under Chapter 7 of the

Bankruptcy Code on September 26, 2012.  On December 21, 2012 the United States Trustee

filed pursuant to § 707(b) of the Bankruptcy Code a Motion to Dismiss Case for Abuse.  The

Motion states that the Debtors could afford a monthly payment of $442.28 for the benefit of their

creditors in a Chapter 13 plan without adjusting their lifestyle or surrendering any property,

which would result in a payment of 46.36% of their unsecured debt without the contribution of

tax refunds.  The Motion sets out:

> By way of example and not limitation, the Debtors: (I) have the
> ability to pay a substantial distribution to their creditors without
> modifying their lifestyle; (ii) did not file his [sic] case as a result of
> some sudden calamity; and (iii) are making payments on luxury
> goods such as a camper and tractor instead of adjusting their budget
> to repay their creditors.

---

[2] *See In re Suttice*, 487 B.R. 245, 254 (Bankr. C.D. Cal. 2013) (determining that the male
debtor's Social Security income should be excluded when assessing ability to pay and that the
debtors needed that income due to significant health problems and to pay costs of a modest
lifestyle).

On January 16, 2013 the Debtors filed a Response, which denied that the Debtors could make the payment as set forth by the United States Trustee and stated a number of changed circumstances comprised of an increased payroll tax and personal property tax, the necessity to purchase a new refrigerator, and an increase in health insurance premiums.  A hearing was held on January 23 at which discovery deadlines were set and on January 29 the Court entered a scheduling order setting a trial date of March 20.

The United States Trustee filed a Supplement to the Motion on March 8, 2013 which alleged that the Debtors had additional income which was not disclosed on Schedule I.  The Supplement set forth that the Debtors deposited $21,185.07 into their bank account which averages $5,296.26 in income per month.  It also alleged that the Debtors knew or should have known that secured payments totaling $338 would be satisfied within a year and this fact should have been disclosed on Schedule J.  In addition to the grounds for dismissal set forth in the original Motion, the Supplement added that the Debtors:

> (iv) filed inaccurate schedules related to their income and expenses which failed to accurately reflect their true financial condition; (v) appear to have stable sources of income; and (vi) even outside of bankruptcy, appear to have the ability to pay their debts over time.

A trial was held on March 20 and both Debtors and a representative from the United States Trustee's office testified.  Mr. Riggs stated that most of the secured debt was incurred between approximately April of 2010, when Mr. Riggs traded in his 2008 Ford F-150 for a 2010 Ford F-150, and December of 2011,[3] when Mr. Riggs used his unencumbered John Deere tractor as collateral to secure a loan of new money of $2,500 from Springleaf Financial Services which he

---

[3] The Statement of Financial Affairs ("SOFA") indicates the date as being November of 2011.

3

used to buy truck tires.  He did not specify the cost of such tires or explain the use made of the

balance of the loan proceeds.  During this time period after Mr. Riggs acquired the 2010 model

Ford F-150 truck in April, the Debtors purchased a camper the next month, in September or

October of 2011 the Debtors purchased household goods comprised of a dinette set and mattress

from Grand Home Furnishings and approximately one month after that Mrs. Riggs purchased a

2011 Ford Fusion in November of 2011.[4]  Mr. Riggs also testified that they purchased the time

share with Bluegreen Vacation Club in 2010.[5]

Prior to filing the Debtors participated in a debt consolidation program for about five

months which began with them making a payment of approximately $600 followed by monthly

payments of approximately $350.  The timing of when this occurred was not pinned down at trial

or in the schedules, but it must have taken place within one year prior to the petition date as the

Debtors noted in their answer to question number 9 of the SOFA that they had paid a total of

$2,076.03 to "Global Client Services" for payments related to debt counseling or bankruptcy in

addition to the amount they had paid to their bankruptcy counsel in this case.  After some time in

the program, the Debtors began receiving calls from their creditors and learned that the debt

consolidation company had not contacted them.  Mr. Riggs testified that their credit card debt

---

[4] Mrs. Riggs explained at trial that she purchased this vehicle after her previous vehicle
was involved in an accident.

[5] This asset was omitted from the original schedules filed in the case.  According to
Amended Schedule A, at the time of filing they still owed $8,658.96 on the time share.  No
monthly payment for this debt was indicated on Schedule J, nor was an amended Schedule D
filed to show the secured debt.  Comparing the Debtors' 2011 and 2012 income tax returns
which were admitted into evidence, it appears that they must have stopped making the payments
on the time share obligation at the beginning of or shortly prior to the 2012 year, as the 2011 tax
return reflects a mortgage interest deduction for $869.48 paid to Bluegreen Corporation for that
year but the 2012 return contains no such indication.

4

went from $22,000 to $30,000 during this period.[6]  At that point the Debtors, according to their

testimony, decided to file for Chapter 7 relief.


THE DEBTORS' FINANCIAL SITUATION AND ITS ORIGINS

On the original Schedule A filed with their petition the Debtors listed their residence

property as having an estimated value of $150,000 subject to mortgage indebtedness of

$161,434.77.  On Schedule B they listed a total of $65,792.35 in personal property.[7]  The total

value of property claimed as exempt in Schedule C is $19,187.36.  The value of all of the

property on Schedule B was either listed as fully encumbered on Schedule D or exempted on

Schedule C except the following:  $50 in misc. pictures, $500 in cats and dogs, $628.75 equity in

the various items of lawn equipment, and $50 equity in the replacement windows.  The Debtors

listed on Schedule D a number of secured claims:  the already noted mortgage debt in the amount

of $161,434.77; a debt of $21,013.34 owed to Eastman Credit Union secured by a 2010 Ford F-

150 valued at $20,530; a debt of $22,073.99 owed to Ford Motor Credit Company secured by a

2011 Ford Fusion valued at $17,980; a debt of $3,950 owed to GECRB/Grand Home

Furnishings secured by a dinette set and mattress valued at $1,300; a debt of $871.25 owed to

John Deere Credit secured by various pieces of lawn equipment valued at $1,500; a debt of

---

[6] This is inconsistent with his earlier statement that they had $30,000 in credit card debt
for a year or two.

[7] Schedule B listed various household goods including some seemingly higher end pieces
such as "(2) beds and bedding" valued at $2,000, "(3) chairs" $900, and a dinette set and
mattress valued at $1,300.  Notable items also include:  two vehicles totaling $38,510, cats and
dogs valued at $500, a 2003 John Deere Tractor valued at $5,000, various pieces of lawn
equipment valued at $1,500, and replacement windows valued at $1,000.

$1,986.89 owed to Kingsport Press Credit Union secured by a 2010 Flagstaff camper valued at $4,400; a debt of $1,899 owed to Springleaf Financial Services secured by a compact tractor valued at $5,000; and a debt of $950 owed to Springleaf Financial Services secured by replacement windows valued at $1,000.[8]   The Debtors did not show any priority claims on Schedule E.  Their Schedule F showed a total of $30,906.76 in general unsecured claims[9] consisting of $29,406.34 of credit card debt involving thirteen separate accounts and $1,500.42 for medical services.[10]

Schedule I represented that Mr. Riggs was "Disabled/Retired" and Mrs. Riggs was the manager of a convenience store.  Mrs. Riggs' monthly gross income was stated as $2,982.89.  Mr. Riggs listed monthly Social Security income of $1,227 and pension or retirement income of $1,487 for a total of $2,714.  The Debtors listed a combined average monthly income of $4,965.93.  Schedule J lists average monthly expenses as $4,942.25.  Notable expenses include: $1,065.26 for rent/home mortgage, $341 for propane/cell phone/cable/internet (this is in addition to $200 for electricity and heating fuel), $152.09 for homeowner's insurance, window payments of $163, GECRB (household goods) $100, JD (lawn equipment) $175, KPCU (camper) $160, and SpringLeaf (tractor) $140.  In answer to Question 19 regarding any increase or decrease in Schedule J expenses anticipated within one year of filing, the Debtors answered "None."

---

[8]  Mr. Riggs testified that the Debtors purchased the replacement windows and lawn equipment at some point during 2008.

[9]  This amount for medical services should have been increased by $1,951.32, the indicated amount of the debt to Lebanon Physical Therapy that was added through an amendment to the creditor matrix on February 27, 2012, although no amended Schedule F was filed.

[10]  $20,115.68 of the credit card debt is listed in Mrs. Riggs' name only.

6

Schedule J showed monthly net income of $23.68.  The Debtors filed Statements of Intention indicating their intent to retain and reaffirm the debts on their real property, the John Deere Tractor, the 2010 Ford F-150, the 2011 Ford Fusion, the 2010 Flagstaff camper, the lawn equipment, the dinette set and mattress, and the replacement windows.  On October 9, 2012 the Debtors filed an Amended Schedule A to disclose a trust agreement in a time share with an unknown value and a secured claim of $8,658.96.  The Debtors also filed an Amendment to the Creditor Matrix on the same day to add Bluegreen Mortgage Department.[11]  The Debtors did not amend Schedule D to list the secured debt nor did they file a Statement of Intention with regard to either the retention or surrender of the time share.  On October 25, 2012 the Debtors filed an Amended Schedule B to disclose Mr. Riggs' ownership of a "DR Power Grader w/4ft remote control" valued at $250.

ACCURACY OF THE DEBTORS' BANKRUPTCY SCHEDULES

During the hearing Mr. Riggs admitted under questioning by counsel for the United States Trustee that Schedule J was incorrect as the monthly prorated expense for the homeowner's insurance was already included in the mortgage payment and should not have been listed separately.  He also acknowledged, with respect to the indication on Schedule J that the Debtors did not anticipate any changes in their scheduled monthly expenses within the following year, that they filed Schedule D at the same time as Schedule J, that the debt owed to John Deere was listed as $871.25 on Schedule D, and that the monthly payment on that debt was listed on

---

[11] In the same Amendment the Debtors also added Endoscopy Center of Bristol and Gastroenterology Assoc., both were listed as "Notice Only."

Schedule J as $175 per month.  He stated he hoped that the debt to John Deere would be paid off in a year.[12]  Making reductions for expenses that could reasonably be anticipated to be eliminated within one year of filing and removing the payment for homeowner's insurance already included in the mortgage payment would result in an additional $490.09 per month of net income.[13]  Mr. Riggs also testified that they had underestimated some expenses on Schedule J such as the

---

[12] According to the Debtors' answers to the United States Trustee's Interrogatories propounded as discovery, this debt was completely paid in January 2013, about three months before the trial of the Motion.  Additionally, the debt to SpringLeaf Financial secured by windows is listed on Schedule D as $950 and a payment upon that debt is provided on Schedule J of $140.  It was later confirmed through Mr. Riggs' testimony that the windows would be paid off within a year of filing.  According to the Debtors' answer to interrogatory number 3, the window payments would be complete in March 2013.  (United States Trustee's Exhibit 7).  In response to a question by the Court, Mr. Riggs stated that payments on the camper would be completed this year.  A comparison of the indicated debt owing to this creditor [$1,987] and the amount of the monthly payment [$160] being paid to amortize this debt seems to make unlikely that satisfaction of this obligation would have occurred within twelve months of the petition filing date, but likely that it would have been completed shortly thereafter.

[13] $152.09 for homeowner's insurance + $175 for John Deere payment + $163 for windows = $490.09.

mortgage payment,[14] personal property tax,[15] health insurance,[16] and transportation.[17]  He also

testified regarding the purchase of a refrigerator in the early part of December of 2012.[18]  The

Debtors' prior refrigerator broke down and they went to Aaron's to purchase a new refrigerator

which would have cost $1,349 if purchased up front.  The Debtors opted for the lease-to-own

---

[14]Debtor's Exhibit G is an Annual Escrow Account Disclosure Statement from Freedom Mortgage.  This Statement is dated December 26, 2012 and shows a present mortgage payment of $1,065.26 (this same amount is reflected on Schedule J) which includes an escrow payment of $275.69 and an escrow shortage payment of $15.32 [a total of $291.01].  Debtors' Exhibit E is an Annual Escrow Account Disclosure Statement dated January 24, 2013, which shows a mortgage payment of $1,088.69 ($291.89 for escrow, plus $27.55 for escrow shortage), which is $23.43 more than the Debtors are currently paying.  Both Statements list an anticipated annual disbursement of $3,502.69 or $291.89 per month.  Exhibit D offered by the Debtors indicates that their residential property has been reassessed with the valuation going from $78,600 to $107,400, but Mr. Riggs acknowledged that the tax rate for 2013 had not yet been set by the County so the effect of the reassessment on the actual tax bill was not determinable as of the time of trial.

[15] Mr. Riggs testified that he and his wife have a significant personal property tax bill which requires monthly payments of $35.  This annual significant liability appears to be a consequence of owning newer cars and recreational vehicles.

[16] During Mr. Riggs' testimony, he stated that his Humana Health Plan requires a $25 per month payment.  On Schedule I the Debtors listed a health insurance deduction of $204.53 from Mrs. Riggs' income and on Schedule J listed $250 per month in medical and dental expenses as well as $11.90 for cancer insurance.

[17] Mr. Riggs stated that his wife had to work more days than anticipated so they estimated that their transportation budget was $50 higher than what was listed on Schedule J, which was already $450.  In the Debtors' answer to interrogatory number 3 they asserted, "Mrs. Riggs is working 6 to 7 days per week because of the shortage of Assistant Managers.  On Sunday she has to make two trips because there is not enough money for bank deposit at the end of her shift.  The transportation expense will increase $50.00 per month." (United States Trustee's Exhibit 7).  This appears to contradict Mrs. Riggs' testimony that she has been considering stepping down from her position for "awhile now" due to the demanding hours that are required.  She testified that in the past she has had to work up to 78 hours in one week.  This budget amount seems high in light of  the fact that Mr. Riggs has been retired for a number of years and therefore has no job-related transportation expenses, but it has not been challenged by the United States Trustee.

[18] The contract with Aaron's, Inc. is dated October 30, 2012.  (Debtors' Exhibit F).

plan requiring a payment of $103.93 per month for 24 months resulting in a total purchase price of $2,494.32.

During Mr. Riggs' testimony, counsel for the United States Trustee elicited the former's acknowledgment of several small pre-petition sales of tractor attachments that were not disclosed on the Debtors' SOFA.  He also inquired regarding the Debtors' tax refunds.  Mr. Riggs testified that in 2011 they received a federal refund of approximately $2,700.  It appears that he may have been thinking about the combined Federal and Virginia tax refunds as Exhibit 9 indicates a $1,937 federal refund and a state refund of $857 for 2011, the sum of which is $2,794.  In 2012 they had to pay $184 with their return for their federal taxes and received a refund of $378 for their state taxes.  This significant change in tax liability from 2011 to 2012 was due in large part to Mrs. Riggs winning the lottery twice in 2012, once in September, prior to the petition filing which occurred later that same month on September 26, in the amount of $2,600[19] and again in December in the amount of $2,700.[20]  With regard to her income, Mrs. Riggs testified that she

---

[19] The income from this bit of good fortune was not disclosed in the answer to question no. 2 (or elsewhere) in the Debtors' SOFA.  It appears that $1,200 of this winning was paid to Debtors' counsel for legal services and costs associated with the bankruptcy filing (see question no. 9 in the SOFA and the absence of any check for such amount in Exhibit 6).  Schedule B reflects ownership of cash in the amount of $500 by Mr. Riggs and $20 by Mrs. Riggs.  The testimony at trial was to the effect that the $500 in cash represented money from the pre-petition winning which was later deposited post-petition into the Debtors' checking account.  The Court assumes that to be correct, although that raises a question as to why the cash was listed as an asset of Mr. Riggs rather than Mrs. Riggs, who the evidence disclosed to have been the lottery winner.  Putting aside that discrepancy, however, still leaves $900 unaccounted for and its disposition was not inquired into at trial or otherwise disclosed by the evidence.

[20] In addition to this additional income from these winnings, their receipt, coupled with a taxable refund of Virginia income taxes of $857, seems to have caused more of the Social Security benefit to be taxable as $10,338 of such income was included in taxable income for 2012 versus only $4,764 in 2011.  The end result was that the Debtors' adjusted gross income was $51,480 in 2012 compared with $38,603 for 2011.  While Mr. Riggs could not remember

10

has received bonuses every year from her employer since her employer was bought out five or six years ago as well as annual raises.  Mrs. Riggs also testified that she is considering stepping down from a managerial position to a cashier position at work due to health concerns, but she stated in response to a question of the Court that she was not considering that when she filed for bankruptcy.  At the time of the hearing she had not made a decision one way or the other nor had she given her employer any formal notice.

This Court has previously held in the case of *In re Meade*, 420 B.R. 291 (Bankr. W.D. Va. 2009), that bonus income should be prorated over the period of employment service to which the bonus relates (i.e., an annual bonus should be prorated over twelve months) and that a debtor's tax withholding for the purpose of determining his or tax expense ought to be adjusted to the amount necessary to amortize the actual tax liability.  *Id.* at 306-07 and 311, respectively. These adjustments were not made to the Debtors' scheduled income and expenses, which did not include on the income side any amount for the recurring bonuses paid to Mrs. Riggs by her employer and on the expense side used her actual withholding amounts rather than the significantly lower figures which would have reflected her actual income tax liability.

---

specifically how they spent the lottery winnings, he stated that the majority of December's winnings were spent on Christmas.  Mrs. Riggs' second lottery win occurred on December 20, 2012.  Mr. Riggs later stated that they used $500 to pay Mrs. Riggs' sister back for a post-petition loan of the same amount.  Earlier during his testimony he stated that they paid her back out of their state tax refund, which would have been inconsistent with the fact that they only received $378 from their state tax return.  When pressed by the United States Trustee, Mr. Riggs could not articulate a reason why they did not use the lottery winnings to pay off the refrigerator.

ANALYSIS OF APPLICABLE STATUTORY PROVISIONS

One of the more intriguing aspects of the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005 ("BAPCPA") is that while the prevention of bankruptcy "abuse" was

unquestionably one of the express principal purposes of that legislation, if not indeed its central

purpose as evidenced by the Act's very title, at no place did Congress undertake to define what it

meant by the use of the term or otherwise set forth general principles for courts to utilize in

determining when such abuse is present.  It did, however, provide in § 707(b)(2) a mathematical

formula which serves those cases which come within its parameters to create a "presumption of

abuse" that, unless rebutted, requires dismissal of the case absent the applicable debtor's

voluntary conversion to Chapter 13.  In general terms under this test the presumption of abuse

arises when the debtor's "current monthly income,"[21] multiplied by sixty, reduced by various

allowed expenses under that subsection, is at least $7,025.[22]  The specificity and rigidity of this

effort to determine "abuse" by the use of a formula at one end of the decision-making spectrum

finds its opposite pole in the broad discretion provided in § 707(b)(3) to bankruptcy judges to

dismiss Chapter 7 consumer bankruptcies upon findings of "bad faith" or "the totality of the

[debtor's] financial situation" supporting a conclusion of perceived "abuse" of the provisions of

Chapter 7.  These two latter tests appear to demonstrate a Congressional realization that it is just

---

[21] This is a defined term under 11 U.S.C. § 101(10A) which expressly excludes "benefits received under the Social Security Act."

[22] The precise statutory formulation creates a presumption of abuse when the end result of the calculation provided in § 707(b)(2)(A)(i) yields a figure which is "not less than the lesser of - (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,025, whichever is greater; or (II) $11,725."

not possible to anticipate in general statutes the myriad of facts presented in the millions of

bankruptcy cases, most involving "primarily consumer debts," which are filed each year.

As already noted, the mathematical model test of abuse provided in § 707(b)(2) begins

with a reference to the debtor's "current monthly income," which is a defined term which

expressly excludes from its calculation any Social Security income.  In that regard it conforms

with § 407 of the Social Security Act,[23] which provides as follows:

> (a) In general.  The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

> (b) Amendment of section.  No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.

> (c) Withholding of taxes.  Nothing in this section shall be construed to prohibit withholding taxes from any benefit under this title, if such withholding is done pursuant to a request made in accordance with section 3402(p)(1) of the Internal Revenue Code of 1986 by the person entitled to such benefit or such person's representative payee.

Section 707(b)(1) provides unmistakable indications of the type of "abuse" about which

Congress was stirred to action.  First, it was concerned about the abuse of consumer debt as the

dismissal provisions of § 707(b) only apply to debtors having "primarily consumer debts."  In

other words, these provisions do not apply to debtors having primarily business or investment

debts no matter how abusive of the provisions of Chapter 7 the particular circumstances of an

---

[23] 42 U.S.C. § 407.

13

individual case might appear to be.[24]  Second, Congress took off the table for consideration under

any of the provisions of § 707(b) any "charitable contributions . . . to any qualified religious or

charitable entity or organization" within the scope of Bankruptcy Code § 548(d)(4) which "a

debtor has made, or continues to make."  Conversely, it did not tie any consideration of "bad

faith" or "totality of the circumstances" to the defined term of "current monthly income" utilized

just in § 707(b)(2).  These differences would appear to demonstrate that Congress was very

attuned to removing as potential fodder for judicial decision-making particular issues which it

deemed so important as to justify such exclusion, impliedly leaving everything else on the table.

Courts have understandably found difficulty in trying to discern the logic behind

excluding Social Security income from consideration under § 707(b)(2) while still perhaps being

able to consider such income under § 707(b)(3) as being part of "the totality of [the debtor's]

financial situation."  In confronting this problem, this Court is reminded of perhaps the most

famous of Mr. Justice Holmes' many memorable observations about the law, "The life of the law

has not been logic:  it has been experience."[25]  Here of course we are dealing with an issue of

interpretation of statutory language rather than the development of the Common Law, but still

the quotation may serve to caution us against a total reliance upon logic to discern the meaning

of the legislative product.  A much more prosaic version of Holmes' famous quotation, as

reasonably adapted for our present purpose, might be, "The accretion of our enacted law is far

---

[24] Notwithstanding the parameters of § 707(b), a recent decision from Judge Kenney of
the Bankruptcy Court for the Eastern District of Virginia reminds us that a debtor's bad faith
may provide cause for dismissal under § 707(a) in cases where the obligations are not "primarily
consumer debts."  *In re Matthews*, No. 13-10521, 2013 WL 1385221, at *7, 2013 Bankr. LEXIS
1319, at *18-19 (Bankr. E.D. Va. April 2, 2013).

[25] *The Common Law* (1881).

14

less the product of logic than it is the often untidy resolution of our competing interests and

ambivalent policy goals."[26]  In seeking to decipher the perhaps untidy resolution of the

conflicting legislative goals of encouraging personal financial responsibility, on the one hand,

and insuring that Social Security benefits serve their intended purpose of providing an

inalienable base of financial security for their recipients from the risks of ill fortune or their own

improvidence, on the other, we may be served by being mindful of another less famous Holmes

comment about the law, "Certainty is generally an illusion, and repose is not the destiny of

man."[27]

　　　　The lack of clarity and judicial uneasiness surrounding this issue of whether Social

Security income can be considered at all under the "totality of the circumstances" test of Code §

707(b)(3) perhaps may be inferred from the Court of Appeals' decision in the case of *In re*

*Calhoun*, 650 F.3d 338 (4th Cir. 2011).  In that case the Bankruptcy Court dismissed the case as

abusive under the "totality of the circumstances" test of Code § 707(b)(3) and unequivocally

ruled that Social Security income could be taken into account under that test.[28]  That ruling was

affirmed by the District Court and the debtors took their case to the Court of Appeals.  Although

the Court of Appeals affirmed the dismissal of the case, it did not adopt the entire rationale

advanced by the Bankruptcy Court, instead agreeing that "the totality of the circumstances of

[the debtors'] financial situation" even excluding the Social Security income demonstrated abuse

--------

[26] "Legislation often results from a delicate compromise among competing interests and concerns."  *In re Welsh*, 711 F.3d 1120, 1133 (9th Cir. 2013)(quoting *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1113 (9th Cir. 2000)).

[27] *The Path of the Law* (1897).

[28] *In re Calhoun*, 396 B.R. 270 (Bankr. D.S.C. 2008).

of the provisions of Chapter 7.  The Court of Appeals noted the following evidence in support of

that conclusion:

> – The Calhouns made payments in the amount of $2,638 a month to
> their unsecured creditors for twenty-two (22) months before filing for
> Chapter 7 relief;
>
> – Testimony demonstrated that the Calhouns did not file for
> bankruptcy as a result of sudden illness, calamity, disability, or
> unemployment;
>
> – The Calhouns' monthly expenses "border on the extravagant" and
> their budget leaves "ample room for reduction";
>
> – The Calhouns paid $439 per month on two life insurance policies,
> including one that would provide for Mrs. Calhoun after Mr.
> Calhoun's death, even though Mrs. Calhoun will receive 75% of Mr.
> Calhoun's monthly income from his retirement account;
>
> – The Calhouns claim to spend $930 per month on food and have
> expenses for cable and internet, laundry and dry cleaning; and
>
> – The Calhouns did not justify their excessive transportation
> expenses.

650 F.3d at 342.  After considering these facts as determined by the Bankruptcy Court, the Court

of Appeals quite understandably noted that the debtors in *Calhoun* had the ability to provide a

significant payment upon their unsecured debt even without their Social Security income when

they had been paying their unsecured creditors for almost two years $2,638 a month when their

Social Security income was $1,459 a month.  Mr. Calhoun had retired from a position as "Chief

Financial Officer" of a hospital and received a generous pension.  They lived on a 3.5 acre

property, which they had unsuccessfully attempted to sell but then decided to "spend over

$130,000 renovating the home with the intention of staying."  650 F.3d at 340.  Their income,

without including the Social Security benefit, still put them "well above" the median income for

16

a household of two in South Carolina. Nevertheless, because of their allowed expenses the

presumption of abuse under § 707(b)(2) was not triggered. *Id.* at 340-41. Clearly under these

facts the debtors had the financial ability to make substantial payments upon their $106,707 of

unsecured debt, but preferred to relieve themselves of that liability while still retaining their

enviable lifestyle in retirement. All three of the courts which considered these facts agreed that

granting the Calhouns a Chapter 7 discharge would be an abuse of the provisions of that chapter

of the Bankruptcy Code. Perhaps needless to say, the facts presented in this case are not nearly

so dramatic as those involved with the Calhouns' "financial situation." Accordingly, this Court

will consider the question which the Court of Appeals was not obliged to decide in *Calhoun*.

The task at hand is to reach an understanding that best reconciles the language of §

707(b)(3) with the logic of other provisions of the Code which endeavor to protect the recipients

of Social Security benefits. Perhaps the best place to start is with two basic principles, the first

of which is that an individual is not entitled to obtain a discharge in a bankruptcy case from the

liability which that person has outside of bankruptcy to pay his or her legally enforceable

obligations, except in accordance with the provisions of the law which Congress has provided.

Indeed for significant portions of the early years of this nation's existence, there was no

bankruptcy law in existence. In short, a bankruptcy discharge is a matter of legislative grace, not

a constitutionally protected right.[29] The second basic principle is that, under the Code, a Chapter

13 case is one which must be commenced by the voluntary and intentional act of an individual or

---

[29] *United States v. Kras*, 409 U.S. 434, 446 (1973); *Greene v. U. S. Dept. of Educ. (In re Greene)*, No. 10-51071, Adv. No. 11-05016, 2013 WL 1724924, at * 4, 2013 Bankr. LEXIS 1636, at * 15-16 (Bankr. E.D. Va. April 22, 2013); *In re Meyer*, 467 B.R. 451, 455 (Bankr. E.D. Wis. 2012).

17

a married couple seeking to obtain the various benefits available in a bankruptcy case under that chapter; similarly, there is no basis to compel such an individual or couple to remain in Chapter 13 even after the case has been filed or a plan has been confirmed.  It is certainly true that in some sense a debtor might feel pressured, for example, to convert a case from Chapter 7 to Chapter 13 as a response to unwelcome actions which the Chapter 7 Trustee might take in the administration of the case or to a motion, such as the one filed in this case, brought by the United States Trustee to dismiss the case as being an abusive filing.  Even in those situations, however, the decision to proceed under Chapter 13 is still a voluntary one because it represents a choice between two possible courses of action having varying burdens and benefits.

In Chapter 13 the debtor is obliged to propose a plan but the provisions of that plan are chosen by the debtor and may not be imposed by a creditor or Chapter 13 Trustee.  Even so, however, the Chapter 13 debtor has no assurance that the plan he or she proposes will pass without objection by some party in interest or be confirmed by the court, but if confirmation is not obtained, the debtor, generally speaking and in the absence of bad faith, may obtain a dismissal of the case.  That might not be what the individual or couple had intended or hoped for, but in no correct sense is such a choice the result of legal duress.  Even in the *Suttice* case holding that Social Security income may not be considered in motions to dismiss filed under § 707(b)(3), it is acknowledged that a Chapter 13 debtor may voluntarily file a plan which proposes, in practical effect, to utilize such income, or more commonly some portion of it, to fund payments to be made under that plan.[30]  So, in actuality, the prohibition in the Social

---

[30] *In re Suttice,* 487 B.R. at 253 ("As a result of the above analysis, the Debtors would not be compelled to fund a chapter 13 plan with their social security benefits, although they may do so voluntarily.");  *See also In re Carpenter*, 614 F.3d 930, 936 (8th Cir. 2010) (Chapter 7 case

Security Act against any benefit under that Act being "subject" to a bankruptcy case has not been

interpreted to preclude a recipient from voluntarily committing money received from such a

benefit for the purpose of funding a Chapter 13 plan, a plan which is voluntarily proposed and

remains voluntary during its entire term.

Only in certain specific situations has Congress expressly taken off the scales of justice

any consideration of Social Security income.  This opinion has already noted that § 707(b)(2)(A)

in establishing a "presumption of abuse" utilizes the debtor's "current monthly income," which

is a defined term under Code § 101(10A) expressly excluding "benefits received under the Social

Security Act," as the starting point.  Accordingly, a presumption of abuse which, unless rebutted,

requires dismissal of the case, will not arise if the establishment of that presumption is dependent

upon inclusion of any Social Security benefit.  So, it seems accurate to observe that Congress has

clearly decided that it is not appropriate to dismiss cases "automatically" upon a mathematically

based "presumption of abuse" where the creation of that presumption is dependent upon the

receipt of Social Security income.  If such were not the case, any possibility of relief under

Chapter 7 would be denied automatically to Social Security beneficiaries in those cases where

the "presumption of abuse" arises under § 707(b)(2)(A) and cannot be satisfactorily rebutted

under the provisions of § 707(b)(2)(B).

---

holding that § 407 of the Social Security Act acts to exclude a pre-petition Social Security
disability lump sum award from the bankruptcy estate but recognizing that Chapter 13 debtors
may propose plans funded with Social Security income); *In re Buren*, 725 F.2d 1080, 1086 (6th
Cir. 1984) (Chapter 13 case noting that by making that Chapter available to individuals with
"regular income" Congress intended "to open Chapter 13 to social security recipients" and
permit "a willing debtor . . . [to] sign his check over to the trustee."); and *In re Schanuth*, 342
B.R. 601, 605 (Bankr. W.D. Mo. 2006) (denying confirmation of a Chapter 13 plan and stating
"Debtors are not foreclosed from filing an amended plan based on their actual income reported
on Schedule I, which income includes Mr. Schanuth's social security benefits.").

The definition of "current monthly income" expressly excluding consideration of Social Security benefits, which became a part of the Code in 2005 as a part of BAPCPA, also comes into play in Chapter 13 cases in two situations:  first, in determining whether the debtor is an above median income debtor within the provisions of Code § 1322(d), which ordinarily means a five year commitment period[31] rather than one of three years; and second, in governing whether under Code § 1325(b), upon objection by an unsecured creditor or the Chapter 13 Trustee, the debtor must devote all "projected disposable income"[32] to the payment of unsecured creditors as the mandatory price of obtaining confirmation of the debtor's plan.  In both of these situations Congress has seen fit to protect Social Security recipients from the application of automatic and general rules having negative consequences to bankruptcy debtors when such application is dependent, to any degree, upon their receipt of Social Security income.  This treatment seems very much akin to § 707(b)(2) already examined above which precludes application of the presumption of abuse provided for in that subsection when such presumption is dependent in any part upon the receipt of Social Security benefits.

So, is there some consistent thread of logic and public policy in these provisions?  This Court believes that in fact there is.  First, it believes that the plain meaning of "the totality of [the debtor's] financial situation" is that the receipt of Social Security benefits, clearly a reliable and

---

[31] *See* 11 U.S.C. § 1325(b)(4).

[32] The starting point for determining "projected disposable income" is the debtor's "current monthly income," which, as previously noted, expressly excludes Social Security income.  *See Hamilton v. Lanning*, 130 S. Ct. 2464, 2469 (2010); *In re Mort Ranta* (also cited as *In re Ranta*), No. 12-2017, 2013 WL 3286252, at *8, 2013 U.S. App. LEXIS 13426, at *26 (4th Cir. July 1, 2013) ("Because the Code expressly excludes Social Security income from 'current monthly income,' and thus, 'disposable income,' it follows that Social Security income must also be excluded from 'projected disposable income.'").

20

continuing source of income, is part of that "totality," a term which strikes this Court as being as inclusive as it is possible to employ.  It finds nothing in § 707(b)(1) or (b)(3) to suggest that Congress intended to exclude wholly the fact of a debtor's receipt of Social Security income from any consideration whatsoever in evaluating the complete picture of a debtor's financial circumstances, as in fact it did do with respect to qualifying charitable contributions.  Second, it believes that Congress recognized that while Social Security income is part of the entire financial picture,[33] it is also "special" and intended for a special purpose.  Therefore, it should not be treated the same as other regular income which a bankruptcy debtor might enjoy.  Accordingly, its receipt is excluded from the operation of general automatic rules which otherwise would require dismissal of a Chapter 7 petition or would require that a Chapter 13 debtor must propose a five year plan or devote **all** projected disposable income to the payment of unsecured indebtedness.  Lastly, Congress recognized that, in a particular case, a debtor's receipt of Social Security income, taking into account all other relevant circumstances presented in that case, might well support a conclusion that the case represented an abusive filing under the general provisions of Chapter 7, or that the use of **some** of a debtor's Social Security income towards the funding of a Chapter 13 plan might be necessary for the court to be persuaded of the debtor's good faith or to satisfy other applicable requirements for plan confirmation, such as, for example, the Chapter 7 "liquidation test" contained in § 1325(a)(4).  To be sure, making such decisions is not as easy as applying fixed and very objective rules or criteria in deciding whether a specific Chapter 7 case should be permitted to go forward or a particular Chapter 13 plan should be

---

[33] The Court notes that Official Bankruptcy Form 61 (Schedule I) requires at line 11 the listing of "Social security or other government assistance."

21

confirmed, but that is ultimately the critical role of a judge – to make fine distinctions and

determinations in those close cases which arguably could go either way. Congress seems to have

recognized that it just was not possible to anticipate every situation which might arise, or to

devise detailed rules which could fairly and appropriately decide every case, or perhaps even to

provide an entirely satisfactory all encompassing definition of what constitutes "abuse" of

Chapter 7 by consumer debtors. Assuming that Congress wished to provide for cases

demonstrating "abuse" by consumer debtors but not coming within the parameters of the

"automatic" rules, it probably had no viable alternative to giving bankruptcy judges the

discretion to weigh all of the circumstances in those atypical cases in the hope that most of the

time they would be appropriate gate keepers to access to bankruptcy relief. This balancing of all

factors presented in particular cases, including both the receipt of and the special nature and

intended purpose of Social Security income, seems to this judge to provide the best coherent and

"holistic" understanding of these statutory provisions.

It having been determined that the Debtors' obligations are primarily, indeed it appears

that they are exclusively, consumer debts, the first item of business would appear to be to

determine the date as of which "the totality of the [debtors'] financial situation" should be

determined – the petition filing date or the date of the hearing on the Motion to Dismiss. The

parties themselves have not raised or briefed the issue, but they seem implicitly to agree that the

Court should examine the situation as of the hearing date. Although that approach seems

somewhat counterintuitive to this judge – to make a determination that a particular case would

constitute an abuse of Chapter 7 based on a debtor's financial situation on a different date than

when the decision was made to seek Chapter 7 relief[34] – the assumption of the parties appears

supported by the weight of the case law the Court has found on the point.  For example, in the

case of *In re Hornung*, Judge Waldrep of the Bankruptcy Court for the Middle District of North

Carolina followed earlier rulings[35] to the effect that "post-petition changes to a debtor's income

and expenses are relevant to the determination of whether a debtor has the ability to repay

creditors in a hypothetical Chapter 13 plan."  425 B.R. 242, 252-53 (Bankr. M.D.N.C. 2010).


CONCLUSIONS OF LAW AND DECISION

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on

July 24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western

District of Virginia.  Determination of a motion to dismiss a particular bankruptcy case and

thereby deny a Chapter 7 discharge to a debtor is a "core" bankruptcy proceeding pursuant to 28

---

[34] It also seems somewhat anomalous in light of the provisions of § 704(b) which provide a very limited period of time after the commencement of a bankruptcy case for the United States Trustee to give notice of intent to proceed with a motion to dismiss on abuse grounds and the provisions of Bankruptcy Rule 1017(e) for a motion to dismiss to be filed.  Such a motion must also "set forth . . . all matters to be considered at the hearing."

[35] *In re Henebury,* 361 B.R. 595, 609 (Bankr. S.D. Fla. 2007); *In re Mondragon,* No. 05-10665, 2007 WL 2461616, 2007 Bankr. LEXIS 2894 (Bankr. D.N.M. Aug. 24, 2007); *In re Lenton,* 358 B.R. 651 (Bankr. E.D. Pa. 2006); *In re Paret,* 347 B.R. 12 (Bankr. D. Del. 2006*)*; *In re Pak,* 343 B.R. 239 (Bankr. N.D. Cal. 2006); and *In re Pennington,* 348 B.R. 647, 651 (Bankr. D. Del. 2006).  *Accord In re Rivers*, 466 B.R. 558, 569 (Bankr. M.D. Fla. 2012); *In re Penninger*, No. 10-52061, 2011 WL 2709321 (Bankr. M.D.N.C. July 8, 2011);  *In re Goble*, 401 B.R. 261, 276 (Bankr. S.D. Ohio 2009); *In re Seeburger*, 392 B.R. 735, 741 (Bankr. N.D. Ohio 2008); and *In re Hartwick*, 359 B.R. 16, 22 (Bankr. D.N.H. 2007) and *In re Haar*, 373 B.R. 493, 501 (Bankr. N.D. Ohio 2007).  *Contra In re Huval*, No. 05-51962, 2006 WL 2846882, 2006 Bankr. Lexis 2670 (Bankr. W.D. La. June 21, 2006) (pre-BAPCPA case holding that circumstances existing as of the filing date ordinarily should be determinative).

U.S.C. § 157(b)(2)(J) and (O).  The Court further concludes that it has the constitutional

authority to adjudicate the Motion.

This is a very close case where one judge might perceive abuse and another might see

debtors of relatively modest means simply seeking a fresh start under circumstances permitting

such an opportunity under the provisions of applicable law.  This Court does find abuse under

the post-BAPCPA version of § 707(b) for the reasons discussed below.

The Debtors give no evidence of having arrived at the financial situation in which they

found themselves in September of 2012 as a result of any sudden untoward event, such as illness,

loss of employment, accident or other unforeseeable calamity, but rather as the result of their

inability to control their impulses to spend and enjoy a pleasant lifestyle upon a foundation of too

readily available consumer credit.  It is true that Mr. Riggs is retired as disabled, but that has

been the situation for more than a decade and during this entire time he has been fortunate to

have had a good pension along with his Social Security benefit.  It appears that the Debtors have

made purchase decisions about consumer products or services which struck their fancy, like so

many of us, on a basis of whether they thought they could make the monthly payment.  That of

course is not uncommon and does not make a case of abuse.  In short, loading up too heavily on

consumer credit does not, standing alone, constitute an abuse of the provisions of Chapter 7

justifying a denial of a discharge under that chapter.  The critical distinction between the two, in

this Court's assessment, is whether the inability of the debtors to continue to make their monthly

payments is the result of some external unexpected event, such as loss of employment, which

pulls the financial rug out from under them.

That was not the case with the Debtors here.  They simply kept acquiring, spending, and borrowing until they swamped their own boat even in relatively calm waters and could no longer stay afloat.  During a period of less than two years, they incurred about $60,000 in new secured consumer debt[36] in connection with six separate transactions involving a new truck, a new car, a new camper, encumbering an already owned tractor for a loan of new money, a time share interest, and household furnishings including a new dinette set and mattress.  Then, instead of attempting to retrench, they decided to keep the things they had acquired, other than the time share with which they apparently had become disenchanted, but walk away from the unsecured debt, mostly credit card in nature but also including a relatively small amount of medical debt, which they had incurred.  Mr. Riggs, who at the time had already been retired for more than ten years, testified that he purchased the new 2010 model Ford F-150 truck because he had the opportunity to acquire a two years newer model truck in place of his 2008 model and end up with a lower monthly payment, but with no indication of how much longer that he would need to make that payment.  It is true that, according to the evidence, Mrs. Riggs bought a new car after her previous one was damaged in an accident, but there was no indication that she even considered purchasing anything other than a new car at a time when they already owed substantial amounts of both consumer secured debt and credit card debt.  Just the monthly payments for the two vehicle transactions together exceeds $850.  The camper payment added a monthly obligation of $160.  The amount of the time share monthly payment obligation is not

---

[36] In their Schedules the Debtors listed debts having unpaid balances as of the petition date in the total amount of $59,582.08, secured by a 2010 Ford F-150 in the amount of $21,013.34, a 2011 Ford Fusion in the amount of $22,073.99, a 2003 John Deere Tractor in the amount of $1,898.90, a 2010 camper in the amount of $1,986.89, household furnishings in the amount of $3,950.00, and the time share debt as indicated on Amended Schedule A of $8,658.96.

determinable from the evidence.  The furnishings acquired from Grand Home Furnishings added a new payment of $100 to their monthly obligations and the loan payment to Springleaf for the $2,500 loan secured by the Debtors' John Deere tractor added $140 more to the total.  These obligations were in addition to the already incurred consumer transactions resulting in monthly payment obligations of $163 for replacement windows, $175 for certain items of lawn equipment which included a second albeit smaller tractor, and their home mortgage payment of $1,065.26, inclusive of insurance and tax escrow expenses.  The aggregate total of these monthly obligations, not including the time share payment, was $2,658.26.  By the time of the hearing on March 20, the $175 monthly payment to John Deere had been eliminated by payment of the debt in full and the $163 monthly obligation for the replacement windows was ending that same month.  It further appears that both the $140 monthly payment for the $2,500 loan secured by the John Deere compact tractor and the $160 monthly camper payment would no longer exist by reason of payment in full within twelve months of the hearing date.  This amounts to an aggregate decrease in monthly obligations payments already effected or in near prospect as of the time of trial of over $635.

To organize this budget information into a more easily followed format, the Court has prepared a chart indicating the Debtors' income and expenses as originally filed, as adjusted on the filing date to reflect the inaccuracies or omissions in the original schedules, and as calculated on the hearing date.

26

| Schedule I | As filed (9/26/12) | As adjusted, to correct inaccuracies | Actual as of hearing date (3/20/13) |
|---|---|---|---|
| Net Monthly Take Home Pay (Mrs. Riggs) | $2,251.93 | $2,179.15 | $2,179.15 (per answer to interrogatory no. 3: 20(a)) |
| Social Security Income (Mr. Riggs) | $1,227.00 | $1,245.00 | $1,245.00 |
| Pension (Mr. Riggs) | $1,487.00 | $1,487.00 | $1,487.00 |
| Tax Refund Monthly Income (Prorated) | $0 | $225.00 (1/12 of 2011 Tax Refund) | $200.00 (est.)[37] |
| VHR Bonus Monthly Income (Prorated) | $0 | $148.52 (1/9 of bonus income, 1/1/12 - 9/25/12) | $70.00 (est.)[38] |
| Combined Average Income | $4,965.93 | $5,284.67 | $5,181.15 |
| **Schedule J** | **As filed** | **As adjusted, to correct inaccuracies** | **Actual as of hearing date** |
| Home Mortgage | $1,065.26 | $1,065.26 | $1,088.69 |
| Electricity and Heating Fuel | $200.00 | $200.00 | $215.00 |
| Propane/Cell/Cable/Internet | $341.00 | $341.00 | $470.00 |
| Transportation | $450.00 | $450.00 | $500.00 |

---

[37] The Court finds that the 2011 tax year refunds are the best indicator of their future tax liabilities in years without lottery winnings.  Because that year, however, received a tax benefit from the mortgage interest deduction for the time share interest which apparently has been surrendered, the Court concludes that reducing the total estimated tax refund by $300 per year ($25 per month) is appropriate.

[38] Mrs. Riggs received a total of $1,670.70 in bonus income for 2012, an average of $139.17 per month.  The evidence creates considerable doubt as to whether future bonus income will approximate that amount.  For the purpose of this decision, the Court finds that an estimate of $70 per month is a reasonable estimate for 2013 and fair to the Debtors.

27

| | | | |
|---|---|---|---|
| Homeowner's Insurance | $152.09 | $0 (included in mtg payment) | $0 (included in mtg. payment) |
| Life Insurance | $60.00 | $61.92 | $61.92 |
| Health Insurance | $0 | $0 | $25.00 |
| Auto Insurance | $160.00 | $160.53 | $160.53 |
| Taxes (personal property) | $0 | $35.00 (est.)[39] | $35.00 |
| Eastman Credit Union (2010 Ford F-150) | $431.00 | $431.66 | $431.66 |
| Ford Motor Credit (2011 Ford Fusion) | $424.00 | $424.62 | $424.62 |
| Springleaf (Replacement windows) | $163.00 | $163.00 (to be paid within one year of filing) | $0 |
| GECRB (home furnishings) | $100.00 | $100.00 | $100.00 |
| John Deere (lawn & garden tractor and other lawn equipment) | $175.00 | $175.00 (to be paid within one year of filing) | $0 |
| KPCU (camper) | $160.00 | $160.00 | $160.00 (to be paid in full within one year of hearing) |
| Springleaf (loan secured by 2003 JD compact tractor) | $140.00 | $140.00 | $140.00 (to be paid in full within one year of hearing) |
| Aaron's, Inc. (refrigerator) | $0 | $0 | $103.93 |
| Other expenses for which no claim of error/change is noted | $920.90 | $920.90 | $920.90 |
| Average Monthly Expenses | $4,942.25 | $4,828.89 ($4,490.89)* | $4,837.25 ($4,537.25)* |

---

[39] The evidence discloses that a monthly debit of $35 per month for this liability was begun in February 2013. The largest element of that liability would likely be for the newest vehicle, the 2011 model Ford purchased by Mrs. Riggs near the end of 2011. Believing that it is probable that this vehicle was included in the 2012 year tax assessment, the Court finds that using the same amount of $35 per month is the best approximation of that year's liability.

28

| Monthly Net Income | $23.68 | $455.78 ($793.78)* | $343.90 ($643.90)* |
|---|---|---|---|

  * Adjusted to include monthly payment obligations ending within twelve months of the petition date or the hearing date, as applicable.


It is apparent that the Debtors themselves have treated the Social Security income received by Mr. Riggs as simply one part of their total household income.  It together with Mr. Riggs' monthly pension check and Mrs. Riggs' earnings are all deposited into the same account from which their living expenses and debt payments are paid.  There is no indication that the income of Mr. Riggs is expended just for his benefit or the earnings of Mrs. Riggs just for her needs, but rather that the income is paid out when particular obligations are due and there is money in the account to pay them.  The Court sees no point in attempting to trace how the Social Security income has been expended when it is obvious that the parties themselves have not dealt with it in that manner.  From the aggregate of all of their income the expenses of a basic standard of living for Mr. Riggs which his Social Security benefit is intended to assure have been and continue to be paid.  The fact that for several months the Debtors paid $350 a month to the debt management company for their unsecured creditors while still taking care of their ordinary living expenses and the debt service obligations which they wanted to maintain is evidence that there is room in their budget to make some provision for their unsecured creditors without putting their welfare at risk.  While the Court of course cannot rule in advance on a matter not before it, a Chapter 13 plan providing for monthly payments averaging just $300 a month for a term of thirty-six months, less an allowance of 20% ($60 per month) for legal fees for Debtors' counsel and the Trustee's commission, with the Debtors paying directly their various secured payments, would appear sufficient to provide a distribution to unsecured creditors of approximately 25% of

29

their scheduled debt.  While there isn't anything magical about 25%, it is the ratio of unsecured

debt which might be paid under a possible Chapter 13 plan which Congress saw fit to utilize in

devising the formula for the "presumption of abuse" set forth in § 707(b)(2).  Accordingly, the

Court will take that as something of a marker as to what debtors who **can** pay **ought** to pay.

Turning to the issue of the accuracy of the Debtors' schedules, the Court agrees with the

United States Trustee that there are deficiencies in those schedules.  The Debtors in fact did

expect their expenses to decrease in the twelve months following their bankruptcy filing but

failed to note that fact on Schedule J.  While the Court regards this mistake as more likely the

result of carelessness rather than an intent to mislead, it nonetheless is a material error.  That is

so because the Court perceives the apparent intent of the question to be to provide an indication

to those who might peruse the income and expense schedules that an ability to pay creditors is in

clear prospect, even if not a current reality at the time of filing.  That mistake is not the only

inaccuracy.  The monthly expenses were overstated in the amount of $152.09 by the double

deducting of the homeowner's insurance cost.  The actual income tax liability was overstated by

the failure to reduce it by the amount of reasonably expected refunds.  While the Court

acknowledges that the actual income tax liability for the 2012 year was significantly higher, and

therefore the amount of aggregate refund much lower, than their experience in 2011, that appears

to be the result of the non-recurring income from the two lottery winnings which Mrs. Riggs

received in that year, one shortly before the filing date although not disclosed in the schedules,

and the other approximately three months later. Neither did these schedules include any

indication of a prorated portion of the bonus income which Mrs. Riggs regularly received from

her employer.  These deficiencies were material and in the aggregate resulted in a quite

30

significant understatement of the Debtors' disposable income after living expenses and secured

debt payments.  As pointed out by the United States Trustee, in the case of *United States Trustee*

*v. Harrelson (In re Harrelson)*, 323 B.R. 176, 179 (W.D. Va. 2005), District Judge Kiser held

that inaccuracies in a debtor's schedules are to be considered in evaluating the possibility of

abuse even if the inaccuracies are not the result of an intent to conceal.  Under the circumstances

presented here, however, the Court for two reasons is not inclined to give these inaccuracies very

much weight.  The first of these is that a review of the information set forth in Schedule D and

Schedule J would make it readily apparent that two of the Debtors' loan obligations would be

paid off very soon, which is the principal criticism leveled by the United States Trustee with

respect to those schedules.  More importantly though, the Court questions how relevant this

factor is to the "totality of the circumstances" prong of § 707(b)(3) under the language of that

subsection.  The Court believes that a test looking to "the totality of the circumstances . . . of [the

debtor's] financial situation" is a more limited and focused inquiry than is one that attempts to

evaluate "the totality of the circumstances" in the case.  That is to say that the current language

fixes our attention on the reality of the debtor's "financial situation," which the Court

understands to be referencing the debtor's ability to pay.  Whether a debtor's schedules are

nearly perfect or riddled with errors doesn't seem particularly relevant to whether a debtor in fact

has a meaningful ability to pay creditors.  On the other hand, evidence that schedules are replete

with mistakes or omissions would seem to be highly relevant to an inquiry whether the debtor is

proceeding in bad faith.  We should bear in mind that the "totality of the circumstances" test was

developed by courts to assist them in determining motions to dismiss for "substantial abuse" in

the face of a statutory presumption in favor of granting Chapter 7 relief.  Under BAPCPA that

31

presumption is no more, as is the necessity to prove anything beyond simply "abuse" of the

provisions of Chapter 7.[40]

What is highly relevant to a debtor's financial situation though is a review of the debtor's

expenses to determine whether they are excessive or otherwise unreasonable.  The only specific

complaint raised by the United States Trustee concerning the reasonableness of the Debtors'

budget is her assertion that they spent money on "luxuries" such as the camper and the John

Deere compact tractor rather than adjusting their budget to pay their creditors.  While the Court

has doubts about the reasonableness of the Debtors budgeting $241 a month for "cell phone,

cable, [and] internet"[41] when they profess inability to pay their unsecured creditors, including

some providers of their healthcare needs, and their claim of $500 per month for transportation

expense beyond their vehicle payments, these are not issues raised by the United States Trustee

and therefore will not be examined further with respect to ruling upon the Motion.[42]  The

purchase of the John Deere compact tractor occurred a number of years prior to the bankruptcy

filing.  In addition their residence property is large enough (4.26 acres per Schedule A) to keep

two horses and a donkey for their grandchildren.  Accordingly, the Court sees no problem with

the original purchase of the tractor.  Offering the tractor as security for the $2,500 loan from

Springleaf is indicative of how the Debtors were unwilling to adjust their standard of living to

---

[40] The United States Trustee bears the burden of demonstrating that the case represents an abusive filing under  § 707(b)(3).  *In re Hardigan*, 490 B.R. 437, 447 (Bankr. S.D. Ga. 2013).

[41] At the time of filing line 2(d) of Schedule J aggregated propane, cell phone, cable and internet expenses at a total figure of $341 a month.  Evidence presented at trial was to the effect that $100 of this amount was allocated to propane.

[42] Bankruptcy Rule 1017(e)(1) provides that "a motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse."

reflect the fact that they were becoming increasingly overextended.  The evidence offered by the

United States Trustee is insufficient to demonstrate that the proceeds of this loan were used to

make luxury purchases.  The purchase of the camper was during the early part of the Debtors'

two year consumer spending spree in 2010-11 and by itself certainly does not demonstrate

extravagance on the Riggs' part, but it is evidence that, at a time when they already owed a

substantial amount of credit card debt of over $20,000, they chose to add to their obligations by

acquiring what they wanted at the time, something very far from being a necessity, by more

borrowing rather than deferring the purchase until they could begin paying down their credit card

debt and getting their financial house in better order.  In summary, while classifying a camper of

this kind as a "luxury" is debatable, it does fit in with the bigger picture that the Riggs are the

creators of their own financial difficulties.


CONCLUSION

One can look with a magnifying glass through the voluminous changes BAPCPA

wrought in the Bankruptcy Code and find no explicit statement that those who can reasonably

afford to make some settlement with their creditors ought to attempt to do so before seeking

relief under Chapter 7.  To reach the conclusion though that this belief was one of the guiding

principles underlying the legislation one must take a step back and compare the legal landscape

before and after BAPCPA's adoption.  Pre-BAPCPA there was a presumption in favor of

Chapter 7 relief which carried the day unless a demonstration of "substantial abuse" was made.

Post-BAPCPA there is no presumption in favor of Chapter 7 relief, a procedure has been put in

place assuring that those consumer debtors most clearly able to pay their creditors will be

obliged to do so in order to obtain a discharge of their unpaid debts, and in cases involving

primarily consumer debts only a showing of "abuse" in any degree of the provisions of Chapter 7

is required to put a debtor to a hard choice – either convert to Chapter 11 or 13 or face dismissal

of your case.  So, the question becomes just exactly what is it that constitutes "abuse" of Chapter

7.  In its 2012 decision in *Maharaj v. Stubbes & Perdue, N.A. (In re Maharaj)*, 681 F.3d 558 (4th

Cir. 2012) authored by Judge Agee, the Court of Appeals for this Circuit did step back and

assess the general purpose and intent of BAPCPA.  In doing so it saw fit to quote and endorse

the following observation made by the Bankruptcy Court for the Northern District of California,

"No one who reads BAPCPA as a whole can reasonably conclude that it was designed to

enhance the individual debtor's 'fresh start.'" 681 F.3d at 574 (quoting *In re Gbadebo*, 431 B.R.

222, 229 (Bankr. N.D. Cal. 2010)).  Similarly, the Supreme Court has provided its own capsule

evaluation of a principal policy goal underlying the "means test" created by BAPCPA:  "to help

ensure that debtors who *can* pay creditors *do* pay them."  *Ransom v. FIA Card Servs., N.A.*, 131

S. Ct. 716, 721 (2011).  This Court concludes that the Debtors' "financial situation" does provide

them the ability to make a meaningful settlement with their unsecured creditors without

sacrificing their standard of living or exhausting Mr. Riggs' Social Security benefit to do so.  It

further concludes, after considerable deliberation, that not to require that of them in order to

obtain a discharge of their remaining legal liability to their creditors, when their financial

predicament is the predictable result of their continued excessive consumer spending and

borrowing rather than one precipitated by some unforeseen external event or calamity,[43] would

---

[43] Judge Davis of the Bankruptcy Court for the Southern District of Georgia in a recent
thorough and thoughtful decision denying a motion to dismiss based on § 707(b)(3), in a case
presenting far different circumstances that those dealt with here, summed up this line of inquiry,

34

constitute an abuse of the provisions of Chapter 7 now in force.

Just as this opinion was in the final stage of its preparation, the Court of Appeals for this Circuit published a decision relevant to the issues presented in this case.  That decision, *In re Mort Ranta,* a citation to which has been added to footnote no. 32 in this opinion, involves a Chapter 13 case in which Social Security income was a major issue.  Accordingly, its possible effect on the rationale of this opinion should be considered.  In *Mort Ranta* the Bankruptcy Court had determined that the debtor could exclude Social Security income from the calculation of his "projected disposable income" but that exclusion should also be given effect in assessing the plan's feasibility.  Accordingly, without the Social Security income, the plan was not feasible and confirmation was denied.  This ruling was affirmed by the District Court, but reversed by the Court of Appeals, which held that the Debtor could rely, if he so chose, upon his Social Security income as might be needed to make the payments committed under the plan and therefore establish its feasibility even though the language of the statute made clear that such income was excluded from any calculation of "projected disposable income."  The Court's opinion expressly noted that "it has long been established that Social Security income may be used to fund a Chapter 13 plan." 2013 WL 3286252, at *10, 2013 U.S. App. LEXIS 13426, at *33.  This Court believes that the rationale of *Mort Ranta* supports the conclusion reached here that while Social Security income is excluded from the operation of any rule which would require that it be devoted to paying all unsecured debt in full, nevertheless the debtor is free to make use of such

---

as one of a number of factors to be considered in determining whether a Chapter 7 filing is abusive, as follows:  "Did Debtor experience some unforeseeable calamity that triggered the filing or did Debtor simply pyramid debt until it became unmanageable?"  *In re Hardigan*, 490 B.R. at 453.

income to obtain a confirmable plan.  Accordingly, it concludes that such decision is in harmony

with, rather than in opposition to, the decision reached in this § 707(b)(3) case.[44]

Therefore, the Motion will be granted unless the Debtors within twenty-one days from

the date of this Decision file a motion to convert their case to Chapter 13.  An order to such

effect will be entered contemporaneously herewith.

DECIDED this 9th day of July, 2013.

_William F. Stone, Jr._

UNITED STATES BANKRUPTCY JUDGE

---

[44] It must be acknowledged, however, that the decision's endorsement in footnote no. 15 (2013 WL 3286252, at *18, 2013 U.S. App. LEXIS 13426, at *31) of the principle that a debtor's "exclusion of Social Security income from disposable income, as required by the statute, by itself, does not constitute bad faith" will require a careful balancing in the Chapter 13 context of a debtor's freedom of action with respect to Social Security income against the court's discretion to decline to confirm a plan which provides only a nominal payout to unsecured creditors by a debtor who can afford to do much better and amounts in practical terms to a slow motion Chapter 7 no asset bankruptcy case with the extra benefit of the broader Chapter 13 discharge.  *See also In re Patrick*, No. 12-03042, 2013 WL 168222, at *5, 2013 Bankr. LEXIS 205, at *14-15 (Bankr. S.D. Miss. Jan. 16, 2013) (Court retains discretion to examine reasonableness of debtor's expenses even when Social Security income is voluntarily included by below-median-income Chapter 13 debtor in plan).

36